The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Welcome to the Fourth Circuit. Please be seated. We'll hear our argument in our first case, the Securities and Exchange Commission v. Clark. Mr. Lisitsa? Did I pronounce that correctly? Yes. Lisitsa, Lisitsa, either one. All right. We'll be glad to hear from you. So, may it please the Court, David Lisitsa of the Securities and Exchange Commission. The legal issue in this appeal is whether the government must have direct evidence of a tip. And we know the answer to that. Courts universally have agreed the answer is no. Circumstantial evidence of a tip is sufficient. The only question for this Court is whether a reasonable jury could conclude that Wright tipped his brother-in-law, Clark, about a merger. If Wright tipped Clark, then Wright breached a duty for personal benefit, Clark knew about that breach in benefit, and Clark unlawfully traded CEB options on the basis of that material non-public tip. And based on the evidence here, a jury could conclude that Wright tipped Clark. Indeed, this case has five main hallmarks of insider trading. Is it crucial for your case that Wright tipped Clark as of a specific date? Yes. All right. What date is that? It's crucial that Wright have tipped Clark prior to Clark first beginning trading on December 9th, 2016. Why is that? Well, December 9th is at some point before that point. So that's when Clark first begins trading on the merger. To follow up on Judge Agee, I mean, there's arguably there might be at some point there's evidence that Wright was brought under the tent. And I think Wright, as I understand it, agreed or there's evidence of that by the 15th of December. And after the 15th of December, you have more than circumstantial evidence, and you have Clark engaged in trading that's very different than before. A lot of the same arguments you make about the trading that begins on the 9th. Why wouldn't that be enough, and why do you have to worry about the 9th? Well, that was the theory of the case, and it makes a lot of sense why that's the theory of the case. Well, now, which was the theory of the case? That the tip occurred prior to December 9th, that Wright is, even if there's a, you know, based on the change in control emails that Wright exchanges with Anschutz on November 3rd, that Wright is in fact aware of the merger long before December 9th. Well, let me ask you a very direct question. If we were to conclude that the evidence was insufficient to find for Rule 50 purposes here that there was a tip on or before December 9th, do you lose? That there was not. Is that the question? Right. Well, let me just explain a bit about the theory, if I can. Well, that's a pretty crucial question, so you're going to need to answer that. Right, and I will, and I think the answer is that we need to demonstrate a tip before December 9th, on or before December 9th. And the reason is that the December 9th trading, the first trades that Clark conducts, he buys options that are expiring on January 20th. He buys 40 options at that point, 20 options that are expiring in March, and CB is trading at the time at $59.50. These options are short-term, and they're at the $65 amount, so he's betting on a tremendous increase in a very short period of time. And in the event that the tip came after that, I think Clark would say, and what the district court said was, well, he's already made massive trades on the merger, and so we accept that in different circumstances, if someone, for instance, was in the securities industry and we see a case like Roger Rotnam, and someone is committed to trading on a certain issuer, but then they obtain, and they get analyst reports that are legitimate, but then they obtain inside information on the side. If they continue to trade, that would be our theory in the case, that it doesn't matter when that first tip was. At that point, that person becomes disabled from tipping. But your point is, if they merely continued what they had done without a tip, you would have . . . that would be fatal to your case. Yes. I mean, that was how it was litigated, and I just think that we disagree with the district court about the evidence that Wright, the reasonable jury could find, that Wright had this inside information prior to December 9th. And I could walk through that, because that is very crucial. Well, it's important to walk through that, but I think the reason you're getting these questions is that there was a lot of evidence after December 9th. And if I'm . . . I mean, both counsel can correct me if this is wrong. My understanding of the record is that the evidence from your expert, uncontradicted, was that there was radio silence from December 9th until whatever day in January of 2017 the merger was announced, which would seem to indicate that there could be insider trading during that period. But what I understand you to say is that if you don't show tipping by December 9th, then the district court should be affirmed. If there was a reasonable jury could find that there was tipping on or prior to December 9th. Right. I think that's the case that we have, and I think it's reasonable given the trading here. I don't know that there's radio silence after December 9th, but I think that it's just the pattern of trading changes drastically. Your own expert witness said that there was no public discussion anywhere about the possibility of this merger during that period of time. I don't think there's any discussion about the merger that constitutes leakage at any time, was the expert's conclusion. This merger was always nonpublic. When announced, it moves the price tremendously. It moves volume tremendously. The expert ran an event study that indicated there was no leakage. I think, though it is crucial to consider the evidence about the tip prior to December 9th. So let's go with the theory, the horse you're riding, the December 9th date. Looking at the record, it looks like you have activities in the years before where Clark would engage in put transactions right before public accounting information was revealed. There it seems pretty clear that Wright has inside information there. So there's no question that the tipper in those situations has the information. Fast forward to what we're talking about now, the actual evidence of, I guess, the record talks about Wright getting information on the trip to London. So I guess the evidence you have is that Wright and Amschutz were close and with each other a lot, talked a lot, and you have some emails about change of control and the consequences of that. What else do you have? I think there's also Wright's emails to employment recruiters. But I think it's important to talk about these change in control emails. We do think that's the strongest evidence. Wright and Amschutz are worried about their unrestricted stock losing out on it because it's unvested. Wright is looking for another job, and they're worried late at night talking about what effect will a change in control transaction have on this restricted stock. There's no other change in control transaction being underway at CEB. In fact, merger negotiations are underway since October. On October 21st, CE boards discusses what it calls this change in control transaction, which is a merger with Gartner, using the same language. And then on November 3rd, there's- Is it correct that the evidence reflects that Wright was actively prospecting for other employment at that time? Yes, and Amschutz was aware of that. A person in these circumstances loses their options if there is a change in control transaction, was one trigger, needed a double trigger. The second trigger was leaving. So that is the- You know, both triggers were involved here with these RSUs, these restricted stock units that were extremely valuable. And, you know, that's what they're worried about. And there's no other discussion about what they're talking about. Amschutz himself says, I was referring to the event. I was referring to what was happening. And what else could it possibly be? There's no other merger on the table, and they're talking about it. And Amschutz is aware of the merger. As of November 1st, that's what CEB tells as part of an internal investigation that is routinely conducted of when did people know things. So Amschutz is aware of change in control. So help me on that issue. You say Amschutz is aware there. He says he doesn't know until Thanksgiving. But you're-I know there's an allegation, maybe the Fenner Report or something, that he may have known earlier. Yes. Help me with the evidence that he knew earlier. He knew at the time of these change of control emails. Right. So the CEB conducts an investigation after FINRA notices this unusual trading. And CEB puts together, like issuers regularly do, a list of when certain employees and officers were aware of the merger. There's a separate determination made for each officer and employee. And CEB says that Wright is aware of the merger as of November 1st. That's at A969 and A983. He's also-you know, he's the chief accounting officer. I'm sorry, Dick. Yes, no. I want you to-and I apologize, I just can't remember this right now. Is that report part of the evidence that was introduced in trial? Absolutely. So that's in the record? Yes. Okay. As are the change of control transactions and emails to recruiters. So what was the evidence in the record that established the validity of that date? Well, if you read, it's part of a packet. There's a whole packet of a response to FINRA that's made, and that's at A953 to 63. Well, why don't you summarize. How did they get that date? So basically what you have is-I think it was Kirkland and Ellis, or Sullivan and Cromwell puts together some major firm is tasked with doing an internal investigation at the firm to determine the dates of awareness for all the officers and employees. Right, and what I'm asking-we know the date was there in the report. What I'm asking is what's the evidence that establishes how they got there? It's discussed in that batch, that they interview people, they have emails, they talk to staff people, they conduct an email review. I think it's sort of a routine internal investigation. I think the question is we got that they interviewed people and came to that conclusion. Is there anything that you can tell us as to what was the basis of them coming to that date? It's not that they did stuff, but what they found when they did that stuff. I just think in the ordinary course that's how these dates are determined, and there's nothing in the evidence that suggests it was different. He's the chief accounting officer, answers reports directly to the CFO. He's not some minor player. It's not a surprise that he is involved in merger negotiations that are underway. Sorry, did someone testify as to the contents of the report? Was there a lawyer from Kirkland and Ellis or some other person that summarized the report and the evidence supporting it? No, and I don't know that there were certain, there were just exhibits about maybe certain drafts made on the other side. No, not about this report. The report itself contains its own findings and discusses how it arrived at that for each individual in broad terms. But no, there's no specific explanation of how the internal investigation determined the date of Wright's knowledge. But it was admitted? Of course, yes, it was admitted. And again, the change in control emails show that on November 3rd, Anschutz is aware of this because he says. He's aware of what? He's aware of merger negotiations with Gardner because there's no, he admits there's no other event or merger offer on the table. What else could, again? Is there, I mean I get your argument that that is circumstantial evidence that he knew and maybe that's enough there. But, I mean, I don't know. Without having inside information, companies like lots of things, people just wonder and hear stuff and there could be just general awareness that there might be something. I mean, there's a difference. I mean, the fact that they're talking about that, I don't know means that he knows about these offers. Now, your argument is it may not, but a jury could conclude that. I get that point. It seems like there's a big difference in knowing about specific offers and being in a company where things get talked about and there might be some potential transaction on the horizon. Well, but the offer gets firmed up along the way. It's not just on November 3rd. So the first offer comes in November 7th. This is all before December 9th. The first offer comes in November 7th. Doesn't that hurt you if the emails are November 3rd, that the first offer is not there until November 7th? No. Merger negotiations can be material long before there is a set price or terms to a deal. That's black-letter law from Basic v. Levinson and TSC Industries. Is there evidence that that was going on here? Yes, and if you read the proxy statement discussing the entire course of the merger negotiations, which is at A936-52, that reviews some of the evidence I'm talking about. For instance, CEB is referring on October 21st to a change in control transaction with Gardner. That's October 21st. By November 3rd, you're having change in control emails between Anschutz and Wright. I mean, that is certainly the strongest circumstantial evidence. Sorry. You spent a lot of time talking about the change in control emails, and I get that. Early on in your argument, you sort of downplayed the other evidence regarding Mr. Clark's efforts to obtain other employment and talking about the fact that he had worked on a merger in promoting his skill set. I mean, you seem to think that that wasn't very significant. I suggest otherwise. I mean, that seems to be pretty powerful evidence. What other merger could he have been talking about at that point? That's why it's the main piece of evidence. There are other pieces I'm happy to go through, but I . . . And, you know, all of this is . . . We can all disagree as to the import and strength of the evidence, but this case was dismissed at the Rule 50 stage. I mean, it would seem clear that this was something for a jury to figure out. I mean, that's certainly our view of the evidence and the case, that this is a very strong insider trading case where we have concealment, we have out-of-the-money, short-term call options, we have expert testimony, we have contact with an insider before the merger is announced. I'm sorry, finish your answer. I apologize. We have parallel trading. We have unusual financing of trades. I mean, it sort of checks all the boxes of what we would consider in our review of an excellent insider trading case. And we don't appeal all of these determinations either. Sometimes this SEC loses summary judgment and does not appeal like in all no holdings and in Trong. You know, we're very careful in our review of what appeal to take, and we just had no answer to why this strong case was taken away from the jury, you know, given . . . Why don't you answer whatever question Judge Quattlebaum has. We've let you go over some, so . . . I appreciate it. Judge Quattlebaum, please. Okay, I'll be real. So, we talked earlier about the post-January 9th activity, and you explained why you thought January . . . I mean, not January 9th. December 9th was the key date. But do you agree that the evidence of Clark's trading after the 9th is part of the circumstantial evidence? Oh, absolutely. Absolutely. And then was it . . . When was . . . didn't . . . wasn't there evidence that Clark, you know, was not completely truthful about his trading in interviews? Yes, that's . . . Clark admitted . . . Was that in evidence? Yes, that was on the trial. That was on a trial testimony. Oh, that was trial testimony? Okay. All right. Thank you. Thank you very much. You've got rebuttal time left, so we'll hear from you again then. Mr. Cummings. Thank you. And I agree that December 9th, 2016, is the critical date in this case. It's a date that the trial court below looked at, heard evidence on. One of the things that we had to deal with is a complaint that had all kinds of wild allegations saying that tips went back to 2008 when Clark started trading. And the reason why I think that historical trade that you pointed to is critical in this case is because the case law they've cited and the case law in the briefs talks about these situations where you've got somebody who's got a history of trading in that particular stock or in that particular way. And what Mr. Clark was trading on back in 2008 to 2015 was the downward pressure on this company, the fact they'd had seven or eight acquisitions and the stock price would be going down. What happened in the fall of... But all of those trades before 2016 were puts where he was betting on the... All but two. Okay. The majority were those. He was betting the stock was going to go down, so he bought a put tied to, serendipitously, the earnings reports of the company. But then we get here in 2016, and now he's doing a lot of calls betting the price is going to go. What happened on November, I think, 7th, Your Honor? On November 1st, there was no discussion about a merger. On November 2nd, Anschutz is not in the room. He's escorted out. The proxy statement reflects that. He's escorted out of the room with other management except for the chief executive officer, and they reject the merger. They reject the offer. So there's no evidence there's going to be a merger until November 7th when, again, behind closed doors, that a firm offer is given for the stock. Counsel, can you... I want to follow up on what you just said. A second ago, there was some discussion about how merger negotiations can precede offers, and, of course, that's true. What I'm trying to figure out here, is there evidence in this case that the merger negotiations were happening before the November 7th offer, or before the first offer? There may have been a phone call back in August between the CEO of Gartner and the CEO of CEB who had announced his retirement in August. There may be a phone call where there was some interest. I lost my train of thought, but those trades, there was clearly downward pressure on the market. This is somebody who watches the stock market. If you read his testimony, which is in evidence, he's got a thesis, and he explains why he did the trades he did, and he lost as much as he made. I think he was directionally correct on about 14 or 15 of his 17 trades. Now, what happens in November? He's watching the market in November. Donald Trump's elected. What happens to the stock market? This stock goes up 24%. I think it's 23% in a fraction. Unheard of in the history of CEB. Going up that much in so short a time. I think the stock market went up 2,500 points. It was wild. Clark watches this. He watches this company. He watches the market. So we're getting into December now. It's a Friday, December 9th. We're getting into the holidays. It's time for me to do something because when this guy's inaugurated, we're going to have another rally. That's what he was betting on. In fact, he corrects counsel during his testimony. These weren't merger trades. I was trading on my observation of this company, the fact we'd had the Trump bump in November, we were going to get another Trump bump, and I made a mistake. I wanted to put him out past the quarterly earnings announcements. Excuse me. So why isn't that an argument that the jury should weigh as opposed to being a Rule 50? I'm sorry, I missed the first part. Why isn't that part of the evidence and the argument to be weighed by the jury in the full context of all the evidence instead of on Rule 50? Because there's no evidence that the tipper had material nonpublic information on December 9th when Clark makes his trades. That's why. And that's what the court focused on. And if you read the court's reasoning, we go back and forth, and they go, well, you'll hear from Mr. Wright when Mr. Cummings calls him. I waited two days for them to put Mr. Wright on. He hung out in the hallway for two days. I've never found a case cited by them where they didn't put the alleged tipper on the witness stand. So they left him off of their case, and they're saying, well, Mr. Cummings will call him, and he'll clear that up. We'll get those memos they're talking about. He had explanations for those. You should look at his deposition that the judge had for the summary judgment. So the judge is aware that he has denied that any of that had anything to do with the merger. He didn't know about the merger until the 15th on his trip to London. He was emphatic about that. And he was corroborated by Anschutz. He's corroborated by the documents. Can I ask a question? You mentioned summary judgment. The district court denied summary judgment. The district court denied summary judgment. So what was the difference in the evidence at the trial as opposed to summary judgment? Because there were 50 views, essentially. Well, the summary judgment, they had Wright's testimony. And Wright denied in his testimony and had explanations for the emails he's talking about. He was getting ready to leave. He was worried about his stock being invested. That's what that was all about. But, of course, they didn't put him on the stand, so we didn't get to hear that. But the judge knew that, and the judge gave them every opportunity to put their case on. So none of the summary judgment evidence you're discussing actually came in at the trial? Well, they didn't put Wright on the trial. And I was going to put him on the witness stand as well as his deposition. So none of that came in for purposes of rule change? No, I didn't get a chance to get my case on, Judge. But he was going to be my witness because he denied that he knew anything until December 15th when he was in London. And he is a lower-level guy. He's not brought in on any of the merger negotiations, and the only reason they brought him in was to help with due diligence. And that testimony is clear in the record. Did the district court, in deciding the Rule 50B motion, address at all the November 3rd exchange of emails between Wright? It came up. I'm asking you directly, did the district court address that evidence and explain why it wasn't sufficient to overcome the motion? He didn't go into that kind of detail? He didn't go into any detail about it. Well, what he said was, you didn't call Wright. And didn't Mr. Anschutz establish when he came under the tent? And didn't Mr. Clark start making these trades before? Doesn't he have a history of this trading? And don't they talk to each other on the phone from time to time? They get together for Christmas and that sort of thing? He did challenge him on that. And he said, and he knows this case law because he referenced, you don't get the inference in these premises. And I argue in my brief that they don't get that. They don't get an inference. They haven't shown that Wright, by circumstantial evidence or direct evidence, that Wright knew until December 15th there was going to be a merger. And then you've got to know what the stock price is going to be if your tip's going to be all effective. So you need to know the stock price, which fluctuated and wasn't agreed on until the afternoon of the 9th. He wasn't there. He was packing for London. Can you tell me what the explanation is for the evidence related to your client's discussions with potential employers and the fact that he had been working on a merger? Can you explain that? Wait a minute, my client? Yeah. Mr. Clark? I think you mean Bill Wright. Mr. Wright, I'm sorry. Oh, well, that's easy. There was discussions about, I'm thinking about moving to Charleston, South Carolina. I want to keep the house I have here and buy the house in South Carolina. Do I have the assets to do that? What are the interest rates like? That was in mid-November, I think, that phone call. It's talked about in Mr. Clark's testimony. But that's what that was about. I'm asking what Mr. Wright was talking about with respect to his employment prospects. Oh, it was a company, I think it was called Benefitus, and they were looking for a CFO, if I'm not mistaken. And my question is, what merger do you think a reasonable jury could have inferred he might have been talking about when he mentioned that he was involved in merger discussions and consummation of work? Well, that's the only one. But then he explained that was mere puffery. He was trying to get a job. Well, that's an explanation. I get that. But why isn't a jury entitled to assess that? Because you have no proof. It's coming directly from him. In a document that he explained ad nauseum. And then if you go to their admissions judge, they admit, and their admissions start on 2487, and they admit they don't have any evidence. They don't raise that. They admit that he didn't know until the 15th. You following me? I'm not sure. Go ahead. I'm listening. So you're saying the SEC admits that Wright didn't know until the 15th of December? They had no direct evidence. They admitted they had no direct evidence and no witness. I understand this isn't a direct evidence case, but you're saying there's no circumstantial evidence that would show that any jury could use to make a determination before December the 15th. The two documents, they related. That's all they had. And I don't think that's sufficient circumstantial evidence to give them an inference, and that's what the judge found. They didn't get the inference. Which two documents are you referencing now? The two that he talked about. The document where he asks Ann Schuetz about what happens to my unvested stock if there's a change in control. Okay, we talked about that, and we knew he was looking for a job. We talked about the FINRA document, which there is an admission that that's often mistaken, and they didn't even put a FINRA person on. And then I guess the other thing would be his puffery to an employer, and I think this was after, it was in January, where he's saying, well, I helped with the merger, I helped tie it up in a bow, and he testified that that was mere puffery. But one of the things they can't get by, and what they just slough by is all these trades. He was getting tipped then, but there's no evidence at all, except one phone call, I think in 2015, that he even talked to Wright when he was doing that history of trading. And the case law talks about that. The case law says you lose the inference when you've got somebody who's been trading, especially in this stock, and you say, well, he was doing puts. But that's the type of trading he was doing. He was betting on the downward pressure in the market, 0.9, 0.8. And then in November, he saw the Trump bump, where the stock went up 23%. Their own expert had to admit that. And then the anticipation, and he starts trading on the 9th, and he hadn't even communicated. There's no communication with Mr. Wright. Do those cases that you refer to involve or have evidence that, with respect to those earlier trades, there was a relative who was an officer of the company? They all involve Sergeant Ginsberg Larrabee. They all involve people that were friends and people that knew each other. I don't know if there was a brother-in-law situation in any of those. Okay. What are we to make about the evidence relating to the phone and your client's failure to turn over his phone? Oh, I'm glad you raised that, Judge. In their admissions, and Clark's admissions, which starts on 8-25-10, admissions 20-25, no request for the phone. Admit that he turned his phone over to his employer. They're doing a little switcheroo here. He had a phone that went bad. You couldn't use the screen anymore with your finger. He turned that into his employer, right? His employer gave him a new phone. That's the phone they wanted to subpoena. So we were able to download a bunch of the text from that phone and provide it to the government. The phone they're talking about was a year later. It didn't even have any information on it relative to the 2016, early 2017 time frame. He lost that at a theater in Tyson's Corner with a car full of kids. He laid it on the bumper, and he talks extensively about that in the testimony, in the trial. That's in the appendix. So which of those two phones did he have in November and December of 2016? The one he turned into his employer, and the phones belonged to his employer. They also admit in the admissions judge that the FBI didn't even ask for these phones. And the SEC had subpoena power until he'd already lost it, until he'd already turned it in. So that's a red herring. That's trying to show that he's concealment. And then the judge even talked about that. Well, he admitted that he knew right within the four corners of his interview with the FBI, and the FBI agent couldn't really remember what it was. They used the present tense or the past tense. So that's another nothing. And, judge, if you go back and you look at the admissions, they have to admit that they're bereft of any evidence to show that Clark knew on December 9th what the stock price was going to be or that there was going to be a merger. He was betting on the Trump bump. He's got a thesis in the... You can find his trading thesis from 673 to 776 in the appendix. Some of his orders didn't even get filed because he was going cheap. He was trying to get the things as cheap as he could. Now, is somebody with a tip going to miss that? Is somebody that's got a tip and knows what the stock price is going to miss that? And I don't know, if he knew, if he had the tip, why wouldn't he have gone at $75? Because the stock price was going to be, I think, 76.25. It was even above 75. He didn't go above 70. Well, I guess one explanation is you don't want to make it too obvious, right? Well, I guess so, judge. I have to agree with that. If you're looking at him with a sinister connotation. But the fact of the matter is the judge heard all these... saw all these... all this evidence, was waiting for them to put right on the stand. Let me be clear about this. I don't know what a jury would ultimately do with this case, but the question is whether or not this case should have gone to a jury to figure out. And I'm not making any judgments about that right now. I just have some concerns about the evidence that apparently the district court seemed to not properly weigh, frankly should have not been weighing, but left it to a jury to figure out. Well, I don't think he weighed it. This is a judge who sat for two days of testimony. We left on a Thursday. We recessed on a Thursday. He had three days to review the record. He was aware of their request for admissions, all the admits they had to do, they didn't have any evidence, especially the older trades. There's no evidence at all that he was tipped on the trades going from 2008 to 2015. So the case law is very strong. That's a powerful piece of evidence that keeps them from getting the inference they so badly want the judge to give them. And the judge says in the... What about the Judge Hilton's conclusions as to what conclusions you could draw from Mr. Clark's interactions with the FBI? Because his conclusion was, well, that's just father lying to protect son, which could be. But wouldn't a jury, wouldn't it be within the universe of possible conclusions that the jury could conclude to the contrary that Mr. Clark lied and therefore his other testimony was not credible? It's an ancillary issue. It involved an allegation to Mr. Clark that his son was taking $48,000 or $49,000 in cash out of a bank, which presumably was a payoff to Mr. Wright, on video with Mr. Clark. None of that's true, of course, but he was baiting Mr. Clark to see what he would say. And Mr. Clark, he said, I clammed up. I shut the interview down. So I think that's an ancillary issue, Judge. Hold up. I thought the agent asked Mr. Clark if he had disclosed any information to his son about trading, and then he later admitted that he did. That's true. Well, isn't that change of story something a jury would be entitled to weigh in a credibility finding? Well, the judge ruled that it wasn't because it's an ancillary issue. Well, I understand that, but that kind of goes back to the central question of what the jury gets to decide and what the judge gets to decide and when they get to decide it. I think the central question, Judge, given the case law and the law in the case law, it's pretty clear that if Clark, that if Wright wasn't aware of material nonpublic information, when Clark made his trades and Clark has a history of trading, they don't get an inference. And I think that's what the judge found. Now, that little ancillary piece you talked about, the judge satisfied himself that that wouldn't even go to the jury, probably. The judge satisfied himself that that's an ancillary issue and that the jury shouldn't have had it. Please go back and look at those admissions when you get a chance. What else could I address? Because I think the case law, if you look at the case law and you look at this evidence, it's very clear, and they say it, I say it, the linchpin of this case is December 9th. And they can't show a phone call, they can't show a communication, they can't show that Mr Wright knew what the material nonpublic information was. I see that my time is up. Thank you so much. Thank you very much. Mr Lozitsa, you've got rebuttal time, so have at it. Oh, thank you. The more I heard my friend talk, the more I thought that that's a lot of good arguments that could be made in a closing argument to a jury, and it should have gone to a jury. It also seems to me that it's Clark's position that requires a great deal of speculation, that there has to be some change in control transaction on the table on November 3rd, but not this merger, and that Clark is a trading savant only when he trades in CEB, and that Clark lied to the FBI to conceal his trading, but for some other reason. But all of these things are explained if Clark is trading on a tip. And I don't know if there's a particular subject that the court is interested in, or the panel is interested in discussing, but I thought, again, it seems like everyone is on all fours in thinking that's a crucial fact. Can you talk briefly about... Your friend on the other side very emphatically pointed out that there's a plethora of cases that suggest that in circumstances such as this, that the SEC's evidence fails as a matter of law. What is it about those cases that you think are different, or why aren't they relevant to this particular set of facts? Well, I'm not exactly sure what cases he's referring to. I think it was mostly about prior trading, perhaps. Well, what about that? You know, the prior trading, he says, actually helps his client, not hurts him. So, I think, you know, the jury could see that trading as further confirmation that Wright was tipping Clark on CEB's intro information. He's got an incredible success rate, trading options only in CEB while his brother-in-law worked at the company. And a reasonable jury could attribute that success... He predicts the post-earnings direction of CEB stock 14 out of 17 times. It's an 82% success rate. Drives an amazing profit from that. And a reasonable jury could attribute it to something other than his investment acumen. Now, to be clear, there are cases where there's prior trading. And they say, well... And it makes it a tougher case when there's prior trading. But usually there's not someone who's their brother-in-law employed at that company at that time, you know, where there's, you know, a close relationship between the two. They live a mile apart. They fraternize, they socialize, they lunch. They have a personal and professional relationship. So a jury could really draw a liability supporting inference or a liability negating inference. We think it's more likely or not when you look at tremendous success really only in CEB, it would be kind of an obscure company. You know, this is an Apple where someone just has the product and they really like it. This is an obscure company where his brother-in-law works there as controller, which is not a low-level position. This is someone in charge of financial... internal financial reporting, gap compliance, external reporting. So I think that's what distinguishes those cases. And a jury could really go... We think it's more likely than not if you look at the history of trading, that it's only in this company and he's got the pipeline to this information. But that's a question for the jury. It is what we think. And then if I could just to, again, go through the evidence about this prior to December 9th. So, you know, October 6th, there's a strategic transaction on the table with Gartner. October 21st, CEB's board talks about a change in control, that change in control transaction. November 1st, then there's an internal investigation that says Anschutz is aware of the merger negotiation. On November 2nd, there's... Gartner's CEO tells his board that he's going to send a written proposal to CEB in the next few days. And they have the change in control emails on November 3rd. But that's not, like, the end of the story. Remember, the trades are in December. Anschutz is close to Wright. He knows he's leaving the company. They spend 400 minutes on the phone together. They have lunch every day in a weekly poker game. And between November 7th and December 9th, when Clark first starts trading, there's six offers to acquire at set prices. The sixth offer comes in at $77 a share on December 7th. During that November 7th to December 9th period, there's 12 text messages exchanged between Wright and Clark. There's also the landline call on December 9th. So during a time when everything's getting firm... So, counsel, just on... I mean, we have those text messages, don't we? I mean, or most of them. And I think there's some evidence that I think is helpful to you. Maybe it's enough, maybe it's not. But text messages and phone calls, when at least on the text messages, they don't contain the information, does that really help in your case? It does because, first of all, it shows close contact in close proximity between an insider and trading. That's really all it does, is that a brother-in-law, two brother-in-laws text a lot. Well, they do, but Ginsburg says that that's part of the picture, it's part of the constellation of evidence, is close proximity of communication. And also I'm just responding to my friend who said there's no communication. We don't have the contents of the text, but we certainly have. In the absence of such communication, we'd be standing up here and they would say, there's no evidence, they said they lived close by, but where is evidence that they communicated? Well, we have that here, 12 text messages and a phone call. And then we also have... So why don't you try to wrap up in the next minute? Sure. You know, I think, you know, merger negotiations, even the identity of the merger company, the company that's going to be acquired, is extremely sensitive, and no one doubts that. And if you look at the change in control emails between Wright and Anschutz, and then Wright's emails to employment recruiters, where he says he's working on the mergers when he first spoke to them on December 8th, and you have a district judge who doesn't even address this evidence. Our point is that we should, in this very, very strong case, that type of evidence, in addition to the concealment, parallel trading, and very suspicious trading, should go to the jury. Thank you. Thank you very much. We appreciate the fine arguments by both counsel in this case. As you know, our normal practice would be to come to the well of the court and greet you in person, but our COVID restrictions are still in place, so we'll simply wish you the best and hope you'll be back in the future when we can resume that practice. So with that, we will move on to get ready for our next case. Thank you.
judges: G. Steven Agee, Albert Diaz, A. Marvin Quattlebaum Jr.